IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IGNITE RESTAURANT GROUP, INC., *et al.*,[1] | ) | Case No. 17-33550 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365 (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH DEBTORS WILL SOLICIT THE HIGHEST OR BEST BID FOR THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (B) APPROVING BIDDING PROCEDURES RELATED TO CONDUCT OF AUCTION, (C) APPROVING BREAK-UP FEE, (D) APPROVING THE FORM AND MANNER OF NOTICES OF (I) PROPOSED SALE OF THE DEBTORS' ASSETS, THE AUCTION AND THE SALE HEARING, AND (II) PROPOSED ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES, (E) APPROVING THE SALE OF THE ASSETS TO THE PARTY SUBMITTING THE HIGHEST OR BEST BID, AND (F) <u>GRANTING RELATED RELIEF</u>**

<u>**NOTICE UNDER BRL 9013-1(B)**</u>

**THIS EMERGENCY MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. THE MOVANT IS REQUESTING AN IMMEDIATE HEARING ON THE RELIEF.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. UNLESS THE COURT SHORTENS THE DEADLINES FOR RESPONDING AS MOVANT WILL REQUEST, YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), are: Ignite Restaurant Group, Inc. (1359); Ignite Restaurant Group – RSC LLC (1791); Joe's Crab Shack, LLC (4189); Joe's Crab Shack – Redondo Beach, Inc. (5107); BHTT Entertainment, LLC (9818); Ignite Restaurants – New Jersey, LLC (5907); Joe's Crab Shack – Maryland, LLC (5297); Joe's Crab Shack – Anne Arundel MD, LLC (9318); Brick House Development, LLC (2944); JCS Monmouth Mall – NJ, LLC (3509); JCS Development LLC (4235).  The Debtors' service address is: 10555 Richmond Avenue, Houston, Texas 77042.

CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this emergency motion (the "Motion"), pursuant to Sections 105(a), 363 and 365 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking entry of two orders: (i) following an initial hearing (the "Bidding Procedures Hearing") to be scheduled on an expedited basis as the Court permits, an order (the "Bidding Procedures Order") (a) authorizing and scheduling an auction at which the Debtors will solicit the highest or best bid for the sale of substantially all of the Debtors' assets; (b) approving the bidding procedures related to the conduct of the auction; (c) approving the break-up fee payable to the Stalking Horse Purchaser (as defined below); (d) approving the form and manner of the notices of (1) the proposed sale of the Debtors' assets, the Auction and the Sale Hearing (each as defined below), and (2) the proposed assumption and assignment of the Debtors' executory contracts and unexpired leases and proposed cure costs related thereto; and (ii) following a final hearing (the "Sale Hearing"), an order (the "Sale Order") approving the sale by the Debtors of the Purchased Assets (as defined below) to KRG ACQUISITIONS CO, LLC (the "Stalking Horse Purchaser") or to the bidder submitting the highest or best bid for the Purchased Assets in connection with the sale and bidding process.  In support of this Motion, the Debtors respectfully show the Court as follows:

## Jurisdiction and Venue

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core

2

proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief requested

herein are Sections 105, 363 and 365 of the Bankruptcy Code.

## Relief Requested

2.      This emergency Motion is filed because the Debtors are operating a restaurant

business that needs to be sold on an expedited basis to preserve value and ensure there can be an

orderly transition of the business to an identified buyer.   While management has engaged in

significant efforts to maintain the business and same-store sales, the trends in the casual dining

segment project further competition and potential erosion of patronage.   Because there are

outside dates that the Debtors believe justifiable under the circumstances that otherwise comport

with the necessary due process to implement a sale, the Debtors have requested an accelerated

time line for the sale process.

3.      An accelerated process is warranted under the unique circumstances of these

Debtors, because they have been evaluating and undertaking a sale process that started in the fall

of 2016.  After months of effort, the Debtors have identified and proposed a transaction with a

capable and experienced buyer that can acquire the assets for a value that is above any others

thus far identified.   However, for important and pressing business reasons, any sale transaction

must close on or before September 8, 2017, or the Stalking Horse Bidder may terminate the

Agreement.  By this Motion, the Debtors request that the Court enter (i) following the Bidding

Procedures Hearing, the Bidding Procedures Order in the form attached hereto as Exhibit A (a)

authorizing and scheduling the Auction; (b) approving the Proposed Sale Process and Bidding

Procedures (each as defined below); (c) approving the Breakup Fee (as defined below) payable

to the Stalking Horse Purchaser; and (d) approving the form and manner of notices of (1) the

proposed sale of the Debtors' assets, the Auction and the Sale Hearing, and (2) the proposed

assumption and assignment of the Debtors' executory contracts and unexpired leases and proposed cure costs related thereto; and (ii) following the Sale Hearing, the Sale Order in the form attached hereto as <u>Exhibit B</u> approving the sale by the Debtors of the Purchased Assets to the Stalking Horse Purchaser or to the bidder submitting the highest or best bid for the Purchased Assets in connection with the sale and bidding process.

## **<u>Background</u>**

4.      On June 6, 2017 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.

5.      On the Petition Date, each Debtor filed a substantially similar motion with this Court seeking to have its bankruptcy case jointly administered with the other Debtors' cases pursuant to Bankruptcy Rule 1015(b).

6.      The factual background relating to the Debtors' commencement of these cases is set forth in detail in the *Declaration of Jonathan Tibus in Support of First Day Applications and Motions* filed on the Petition Date and incorporated herein by reference.

7.      The Debtors have continued in possession of their properties and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      As of the date of this filing, no official committee of unsecured creditors has been appointed in any of these cases, and no request has been made for the appointment of a trustee or examiner.

A.      **The Debtors' Business**

9.      The Debtors operate a portfolio of two restaurant brands, Joe's Crab Shack ("Joe's") and Brick House Tavern + Tap ("Brick House"), consisting of 112 Joe's locations and 25 Brick House locations across 32 states and three Joe's franchises in Dubai, U.A.E. (collectively, the "Business").

10.     In 1991, the first Joe's Crab Shack opened in Houston, Texas.  With the creation of the Brick House concept in 2008, the company changed its name in 2009 to Ignite Restaurant Group.  In 2013, the Debtors acquired Romano's Macaroni Grill, which it later sold in 2015.

11.     The market for casual dining has been deteriorating for some time.  The Debtors have continued to experience declining financial performance and declines in comparable restaurant sales and income from operations at Joe's and Brick House. The Debtors have closed underperforming restaurants and implemented cost reduction measures to help mitigate the effect of these declines and improve their financial position and liquidity, but have not been able to overcome the trends in this business segment. In late 2016, the Debtors engaged a financial advisor and investment banker, Piper Jaffray & Co. ("PJC"), to assist the Debtors in evaluating various strategic alternatives available to the Debtors.   After evaluating the options, and the continued pressures of the business climate, the Debtors commenced a process to pursue the sale of the Business and determined in their business judgment that a sale of the Debtors' assets would result in the best recovery for all of their stakeholders.

12.     Despite their continuing efforts to improve performance and to build sales, the Debtors have been unable to comply with their obligations under their credit agreement with Credit Suisse AG, Cayman Islands Branch and certain pre-petition lenders (the "Pre-Petition Lenders").  In April 2017 the Debtors defaulted on those obligations.  The Debtors and the Pre-

Petition Lenders entered into a Forbearance Agreement on March 31, 2017, which terminated on June 6, 2017.

**B.   Sale Process**

13.   The Debtors originally commenced the process of evaluating financing and sale options in September 2016 with the hiring of PJC as their exclusive investment banker. Under the terms of its agreement and to assist the Debtors in determining the best strategic alternative available to them, PJC explored debt refinance, structured equity, minority capital and full sale transactions. At the Debtors' direction, PJC contacted numerous parties from September 2016 to January 2017 to determine their interest in the acquisition of, or investment in, the Debtors. Specifically, PJC contacted 83 strategic and financial potential bidders, and 105 potential lenders or providers of capital. Of these contacted parties, 37 potential bidders and 83 potential lenders or providers of capital ultimately negotiated confidentiality agreements and were provided a confidential information memorandum. Interested parties were asked to participate in an initial discussion with PJC to hear about the opportunity and ask questions about the Debtors' assets. Parties that demonstrated sufficient interest in  a possible transaction were then given access to further initial due diligence information and invited to conduct calls with management. Through this process, seven potential bidders and two potential lenders or providers of capital provided verbal or written indications of interest.

14.   However, amid continued declining same store sales trends, the degradation of restaurant-level margins, and broader concerns that surfaced in media and analysts reports regarding the casual dining and restaurant sector as a whole,  these trends created an extremely challenging backdrop for investors. Certain parties who submitted proposals to invest in or acquire the Debtors withdrew these proposals. The remaining offers were not viewed as viable,

or capable of being closed.  Concluding that all alternatives had been exhausted, the Debtors pursued a path to secure a stalking horse bid for the sale of substantially all of their assets.

15.     At the Debtors' direction, PJC approached interested parties to secure a stalking horse bidder for the sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code. While all previous indications of interest received since the Fall of 2016 were considered, PJC particularly reached out to parties who had expressed substantial interest in acquiring the Debtors through a bankruptcy proceeding in the previously conducted marketing process, as well as additional parties with expertise in acquiring distressed assets. In total, during this most recent phase of the sale process, PJC contacted 44 strategic and financial potential bidders to serve as a potential stalking horse bidder, of which 33 ultimately negotiated confidentiality agreements and were provided a confidential information memorandum.  Six potential bidders submitted indications of interest to acquire the Debtors, and three of those potential bidders continued their diligence process and submitted markups of an asset purchase agreement to acquire the Debtors. Of these parties, the Stalking Horse Purchaser (an affiliate of Kelly Investment Group0029 emerged as the highest and best bid, based on the business judgment of the Debtors and its advisors, after considering all other options and following an extensive effort to negotiate favorable terms.

**C.     The APA and Proposed Bidding Procedures**

16.     On June 5, 2017 the Debtors entered into that certain Asset Purchase Agreement with the Stalking Horse Purchaser, a true and correct copy of which (excluding Schedules) is attached hereto as <u>Exhibit C</u>, (the "<u>Agreement</u>").[2]  The Agreement contemplates the sale of the

---

[2] The following description of the Agreement is qualified in its entirety by the provisions of the Agreement.  In the event there is any conflict between the description of the Agreement contained in this Motion and the provisions of the Agreement, the provisions of the Agreement shall govern and control.

Purchased Assets to the Stalking Horse Purchaser (subject to higher or better bids) and contains the following material terms:

- Purchase Price – In addition to the assumption of the Assumed Liabilities, $50,000,000 by wire transfer of immediately available funds to a bank account as shall be designated in writing no later than one (1) day prior to the closing date, which amount shall be (i) reduced by (w) the amount of the Good Faith Deposit delivered to Sellers as a credit against the Purchase Price in accordance with <u>Section 2.8(b)</u> of the Agreement, (x) the Transfer Tax Estimate for Purchased Locations, (y) the Property Tax Estimate for Purchased Locations and (z) 50% of the Gift Card Sales and (ii) increased by (x) the Prepaid Rent for Purchased Locations, (y) the Deposits for Purchased Locations, and (z) the Store Cash Amount;

- Purchased Assets – The "<u>Purchased Assets</u>" include certain of the Debtors' assets including, but not limited to, all rights of Sellers under the executory contracts and unexpired leases specified in the Agreement (collectively, the "<u>Assigned Contracts</u>") subject to <u>Sections 7.5(d)</u> of the Agreement, certain cash and cash equivalents, certain inventory and tangible personal property, certain permits, all intellectual property rights, and data and records;

- Assumed Liabilities – all liabilities and obligations related to or arising in connection with the business or the Purchased Assets from and after closing, all liabilities and obligations related to the Assigned Contracts, all liabilities and obligations related to or arising under the Permits included in the Purchased Assets from and after closing, all adequate assurance of future performance costs and expenses associated with the Assigned Contracts, all liabilities and obligations of Sellers arising under outstanding gift cards, and all Transfer Taxes and all Property Taxes that are attributable to the Purchased Assets;

- Cure Costs – Debtors shall have sole responsibility for paying any Cure Costs due in connection with the assumption and assignment of the Assigned Contracts (a) that are Real Property Leases and (b) that are personal property leases (collectively the "<u>Lease Cure Contracts</u>"). Purchaser shall have the sole responsibility for paying Cure Costs due in connection with the assumption and assignment of all other Assigned Contracts.

- Good Faith Deposit – $2,000,000.  Half of the Good Faith Deposit ($1,000,000) shall be deposited by the Stalking Horse Purchaser with the escrow agent on the execution date of the Agreement, and the remaining amount of the deposit to be deposited by the Stalking Horse Purchaser with the escrow agent following entry of the Bidding Procedures Order by the Court;

8

- Proposed Breakup Fee Payable to the Stalking Horse Bidder– $1,500,000, plus Sellers shall direct the escrow agent to return the Good Faith Deposit to the Stalking Horse Bidder.

- Designation Rights – The Agreement gives the Stalking Horse Purchaser the ability, through October 15, 2017, to designate certain contracts, agreements and leases as either Excluded Assets or Purchased Assets (the "Designation Rights Assets").

- Management Agreement – The Agreement includes the Management Agreement, which provides that the Debtor will manage, control, and operate certain restaurants during (a) with respect to the restaurants that are purchased by the Stalking Horse Purchaser through the Agreement, during the period that the Stalking Horse Purchaser obtains from the relevant state and/or local government regulatory authorities the Liquor License Approvals and/or Permits, as applicable, and (b) with respect to each real property lease that has been designated as a Designation Rights Asset, until such restaurant has either been designated a Purchased Assets or Excluded Asset.

- Outside Termination Date – The Agreement may be terminated if Closing does not occur on or before September 8, 2017.

17.     The Agreement with the Stalking Horse Purchaser will be further "tested" in the marketplace by the sale and bidding process described below, so as to ensure that the Debtors' estates realize the maximum value for the Purchased Assets.  The Debtors  have developed the following proposed process for continuing to market the Purchased Assets for sale (the "Proposed Sale Process") in connection with concluding a prompt sale of the Business.  In connection therewith, the Debtors request that this Court approve the Proposed Sale Process, including the following bidding procedures (the "Bidding Procedures"):

(i)     Initial Overbid.  Any third party (other than the Stalking Horse Purchaser) that is interested in acquiring the Purchased Assets must submit an "Initial Overbid" at or prior to thirty-five (35) days after the Court's entry of the Bidding Procedures Order (the "Bid Deadline").  Any such Initial Overbid must:

(a)     Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Agreement, including all schedules and exhibits to the Agreement) with, at a minimum, the following requirements:  (w) having substantially identical terms and conditions as this Agreement except with higher and better consideration; (x) containing terms and conditions no less favorable

9

to the Debtors' estates than the terms and conditions in the Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (y) provide for a purchase price in an amount equal to or greater than the sum of (1) the Purchase Price, (2) the Breakup Fee, and (3) $500,000 (the "Initial Overbid Amount"); and (z) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Purchased Assets other than those included in the Agreement;

(b)     Include a cashiers' or certified check in the amount of $2,000,000 to be held as a deposit (it being understood that the deposit may also be sent by wire transfer of immediately available funds) in an account maintained by the Escrow Agent;

(c)     To the extent not previously provided to the Debtors, be accompanied by evidence satisfactory to the Debtors in their commercially reasonable discretion that the overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the Prevailing Bid (as defined below) at the Auction (as defined below);

(d)     Remain open and irrevocable until the date that is 60 days after the conclusion of the Auction; and

(e)     Be submitted to (i) Ignite Restaurant Group, Inc., 10555 Richmond Avenue, Houston, Texas 77042, Attention: Jonathan Tibus (JTibus@alvarezandmarsal.com), (ii) counsel to the Debtors, King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309, Attention: Sarah R. Borders, Esq. (email: sborders@kslaw.com), (iii) Piper Jaffray, 50 California Street, Suite 3100, San Francisco, CA 94111, Attn: Teri Stratton (email: teri.l.stratton@pjc.com); (iv) Office of the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, Texas 77002,  (Facsimile: (713) 718-4670); and (v) counsel for any official committee of unsecured creditors appointed in these cases, in each case so as to be received not later than the Bid Deadline.

(ii)     Auction.   In the event that the Debtors timely receive a conforming Initial Overbid from a prospective purchaser as described above (a "Qualified Bidder"), then the Debtors will conduct an auction (the "Auction") with respect to the sale of the Purchased Assets.  The Debtors shall hold the Auction for the Purchased Assets at the offices of King & Spalding LLP, 1180 Peachtree Street, N.E., Atlanta, Georgia 30309, commencing on a date and time established at the Bidding Procedures Hearing, or at such other time and location as may be designated by the Debtors.  Based upon the terms of the qualified bids received

and such other information as the Debtors determine is relevant, the Debtors (in their discretion) may conduct the Auction in the manner the Debtors determine will achieve the maximum realizable value for the Purchased Assets. The Stalking Horse Purchaser under the Agreement shall be deemed a Qualified Bidder at the Auction.  In order to participate in the Auction, each Qualified Bidder shall be required to comply with the requirements of the Bidding Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bidding Procedures.  At the Auction, Qualified Bidders and the Stalking Horse Purchaser (it being understood that the Stalking Horse Purchaser shall be deemed to be a Qualified Bidder) may submit successive bids in increments of at least $100,000 (or such other amount that the Debtor determines in its reasonable discretion)  in cash greater than the prior bid for the purchase of the Purchased Assets until there is only one offer that the Debtors determine, subject to Court approval, is the highest or best offer for the Purchased Assets (the "Prevailing Bid").  When bidding at the Auction, Purchaser shall receive a "credit" in the amount of the Breakup Fee.   All bidding for the Purchased Assets will be concluded and final at the conclusion of the Auction and there will be no further bidding at the Sale Hearing.  Subject to court availability, the Sale Hearing shall be scheduled no later than four (4) days after the Auction.  If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Bid Deadline, the Auction will not be held and the Sale Hearing will proceed with respect to the Agreement.  In determining the Prevailing Bid, the Debtors will consider, among other things: (i) the number, type and nature of any changes to the Agreement requested by each bidder; (ii) the extent to which such modifications are likely to delay closing of the sale of the Purchased Assets and the cost to the Debtors of such modifications or delay; (iii) the total consideration to be received by the Debtors; (iv) the nature of the consideration to be received by the Debtors; (v) the likelihood of the bidder's ability to close a transaction and the timing thereof; and (vi) the net benefit to the Debtors' estates. In the event that the Qualified Bidder who submitted the Prevailing Bid (the "Prevailing Bidder") fails to close on the transaction contemplated in the Prevailing Bid, the Debtors shall be permitted to retain the Prevailing Bidder's good faith deposit as liquidated damages.

(iii)   Breakup Fee.  Subject to subsection (iv) below, upon the approval of a sale of all or substantially all of the Purchased Assets to any third party (other than the Stalking Horse Purchaser) who submits a Prevailing Bid for the Purchased Assets, the Debtors shall cause the Escrow Agent to return the Good Faith Deposit to the Stalking Horse Purchaser. Upon the consummation of a sale of all or substantially all of the Purchased Assets to any third party (other than the Stalking Horse Purchaser) who submits a Prevailing Bid for the Purchased Assets, Debtors shall cause the Escrow Agent to return the Good Faith Deposit to the Stalking Horse Purchaser and shall pay to the Stalking Horse Purchaser cash or other immediately available funds in an amount equal to $1,500,000 (the "Breakup Fee"), which shall not be encumbered by any of the liens or security interests of any other person, including the Debtors' secured lenders; provided, however, the

Breakup Fee shall not be due and payable if the Stalking Horse Purchaser has committed a material breach of the Agreement prior to the consummation of such sale to the third party. The Breakup Fee shall be an allowed administrative expense claim in these bankruptcy cases upon affirmation under the Bidding Procedures Order, and shall be paid to the Stalking Horse Purchaser within three (3) Business Days following the closing of such sale to a third party, and shall be paid to the Stalking Horse Purchaser prior to the payment of the proceeds of such sale to any third party asserting a Lien (as such term is defined in the Agreement) on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee).

(iv)    <u>Backup Bid</u>. At the conclusion of the Auction, the Debtors shall identify and certify the bid that constitutes the second highest or best offer for the Purchased Assets (the "<u>Backup Bid</u>" and the Qualified Bidder submitting such bid, the "<u>Backup Bidder</u>"). The Backup Bidder may be required by the Debtors to close on the Backup Bid no later than sixty (60) days of the conclusion of the Auction and no sooner than ten (10) Business Days after the date the Backup Bidder receives written notice of the requirement to close on the Backup Bid, which notice shall be given no later than thirty (30) days after the Auction. In the event that the Backup Bidder fails to close on the transaction contemplated in the Backup Bid, Sellers shall be permitted to retain the Backup Bidder's good faith deposit as liquidated damages and that shall be Seller's sole and exclusive remedy in connection with such failure. Notwithstanding the foregoing, nothing in this subpararaph(iv) shall prevent the Stalking Horse Purchaser, even if designated as the Backup Bidder, from terminating the Agreement pursuant to <u>Section 12.1(b)</u> of the Agreement  and, in the event of any such termination, the Stalking Horse Purchaser shall be entitled to return of the Good Faith Deposit.

(v)    <u>Sale Hearing</u>. The Sale Hearing will be conducted before this Court at a date and time established in the Bidding Procedures Order, at which time the Debtors intend to present the Prevailing Bid for approval by the Court pursuant to the provisions of sections 105, 363(b), 363(f), 363(m), 363(n) and 365 of the Bankruptcy Code. The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing. Upon the failure to consummate a sale of the Purchased Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the Prevailing Bid, the Backup Bid, as determined as soon as practicable after the conclusion of the Auction, and as disclosed at the Sale Hearing, shall be deemed the Prevailing Bid without further order of the Court and the parties shall be authorized to consummate the transactions contemplated by the Backup Bid. The party submitting the Backup Bid may be required by the Debtors to close on such bid within sixty days of the conclusion of the Auction.

(vi)    <u>Highest and/or Best Bid</u>. At all times during the sale process through the conclusion of the Auction, the Debtors shall retain full discretion and right to determine, in the exercise of their business judgment, which bid constitutes the highest or otherwise best offer for the purchase of the Purchased Assets, and

12

which bid should be selected as the Prevailing Bid, if any, all subject to final approval by the Court pursuant to the provisions of section 363(b) of the Bankruptcy Code. Without limiting the generality of the foregoing, the Debtors may, at any time before the conclusion of the Auction, reject any bid that the Debtors determine is (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors, their estates, their creditors or their other stakeholders. The Debtors may adopt rules for the Auction that, in their judgment, will better promote the goals of the Auction (provided that such rules shall not be inconsistent with the Bidding Procedures Order).

(vii)  <u>Sale Implementation</u>. Following the approval of the Prevailing Bid at the Sale Hearing, the Debtors will be authorized and directed to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid.

**Basis for Relief**

18.     The Debtors currently believe that the Proposed Sale Process provides the Debtors with their best opportunity to preserve and maximize the value of the Business and the Purchased Assets for the benefit of their estates and, therefore, the Debtors believe that implementation of the Proposed Sale Process, and approval of any sale that is presented in accordance therewith, is in the best interests of the Debtors' creditors, employees, estates and other stakeholders. As such, the Debtors submit that approval of this Motion and the Proposed Sale Process is consistent with applicable law and should be granted.

A.      **Section 363(b) Authorizes the Proposed Sale and Sale Process.**

19.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The proposed use, sale or lease of property of the estate may be approved under section 363(b) of the Bankruptcy Code if it is supported by sound business justification. *See e.g. Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines)*, 780 F.2d 1223, 1226 (5th

Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park Partnership*, 96 B.R. 707, 714 (Bankr.W.D.Tex. 1989). In reviewing a proposed sale of assets, a bankruptcy court should give deference to the business judgment of a debtor in possession when it deems the sale to be appropriate. *See Esposito v. Title Ins. Co. (In re Fernwood Mkts.)*, 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987); *see also In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same; *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "bankruptcy court can authorize a sale of all of a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re Phoenix Steel Corp*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a § 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith).

20.     Although the Debtors cannot predict the results of the Proposed Sale Process and the Auction, the Debtors respectfully submit that the proposed sale and Proposed Sale Process fit squarely within the parameters of the sound business judgment test articulated in the above-

referenced authorities.  They also are reflective of sound management and business practices, and are in accord with obtaining the highest value possible in a difficult business segment.

21.     First and foremost, the Debtors have articulated a sound business purpose for any transaction emanating from the Auction, including as a baseline the sale under the Agreement to the Stalking Horse Bidder.  As set forth above, the Debtors have determined that it is in the best interest of their estates and stakeholders to consummate a sale of their assets.  In order to monetize the Purchased Assets for distribution to creditors and other stakeholders, it is critical that the Debtors be permitted to consummate a sale of the Purchased Assets pursuant to the Proposed Sale Process.  The Debtors believe that the Purchase Price reflected in the Agreement is fair and reasonable and the Debtors would be prepared to close a transaction with the Stalking Horse Purchaser even if no Initial Overbid is submitted by a competing bidder.

22.     The Debtors respectfully submit that the notice and timing of the Proposed Sale Process are adequate and fair, and are reasonably calculated to elicit the highest levels of interest in acquiring the Purchased Assets.  As described above, the Debtors have engaged in reasonable and appropriate marketing of the Business and the Purchased Assets and strongly believe that their efforts, coupled with the Proposed Sale Process outlined above, will garner the highest and best possible value for the Purchased Assets.

23.     The Debtors have made, and will continue to make, diligent efforts to seek out all potentially credible buyers, having already contacted numerous parties.  As in the case of *Delaware & Hudson Ry. Co.*, the substantial solicitation and marketing efforts of the Debtors support the proposed process and the reasonableness of any offer ultimately presented through that process.

24.     Moreover, because the Proposed Sale Process will create a fair and reasonable environment in which all legitimate and qualified interest in the Business and Purchased Assets can be presented in a competitive, open and level playing field, any offer presented in accordance with the terms of the Proposed Sale Process will necessarily be negotiated and presented in good faith.  In connection therewith, the Debtors will be prepared to present further evidence of good faith during the course of the Sale Hearing that will satisfy this Court and the mandates of Section 363(m) of the Bankruptcy Code.

25.     The Debtors intend to give notice of the Bidding Procedures Hearing, the Auction, the Proposed Sale Process, the Sale Hearing and the proposed sale by the Debtors of the Purchased Assets, by mailing a copy of the Motion, on or before June 6, 2017, to (i) the parties on the Master Service List established in these cases, which will initially comprise (a) all government entities and creditors entitled to be provided notice under the Bankruptcy Rules, (b) the 30 largest unsecured creditors, (c) all secured creditors, and (d) the United States Trustee; (ii) any parties who previously have expressed serious interest in acquiring all or substantially all of the Purchased Assets; and (iii) all parties known by the Debtors to assert a lien or security interest in the Purchased Assets (the persons listed in clauses (i) through (iii) are referred to collectively as the "Notice Parties"; provided, however, that notwithstanding anything herein to the contrary, any notices sent to the parties set forth in clause (ii) will be sent by electronic mail). In addition to the foregoing, the Debtors also propose to give additional notice by mailing (a) a copy of any Bidding Procedures Order entered by the Court within three business days of its entry to each of the Notice Parties, (b) a copy of the Auction Notice (as such term is defined in the Bidding Procedures Order) within three business days of entry of the Bidding Procedures Order to the Notice Parties, all persons and entities listed in the Debtors' Mailing Matrix, all

non-debtor parties to the Debtors' executory contracts and unexpired leases, all entities (including governmental entities) known to the Debtors that may have the right to file a fine, penalty or lien against the Purchased Assets or the Debtors, and all creditors known to the Debtors, and (c) a copy of the Cure Notice (as such term is defined in the Bidding Procedures Order) within three business days of entry of the Bidding Procedures Order to all non-debtor parties to the Debtors' executory contracts and unexpired leases.  The Debtors submit that the foregoing is sufficient notice of the Auction, the Proposed Sale Process (if and in whatever form approved at the Bidding Procedures Hearing), the Sale Hearing and the proposed sale by the Debtors of the Purchased Assets.

26.     By this Motion, the Debtors intend to sell the Business in order to monetize the Purchased Assets for distributions to their creditors and other stakeholders.  The Debtors strongly believe that, in furtherance of this goal, they have done all that is reasonably possible to secure the highest or best possible offer for the Purchased Assets under the circumstances.  For all of the foregoing reasons, the relief requested in this Motion is a product of sound business judgment and is in the best interests of the Debtors, their creditors, employees, estates and other stakeholders, and should be granted.

27.     Accordingly, the Debtors submit that the Proposed Sale Process, and any sale presented in accordance therewith, is warranted and appropriate under the terms and provisions of Section 363(b) of the Bankruptcy Code.

**B.      Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

28.     The Debtors request that the sale and transfer of the Purchased Assets be approved free and clear of all Liens (as such term is defined in the Agreement), other than those

specifically assumed by the party submitting the Prevailing Bid.  Such relief is consistent with the provisions of Section 363(f) of the Bankruptcy Code in these cases.

29.     Section 363(f) provides that a debtor-in-possession may sell property free and clear of any lien, claim or interest of another entity in such property if any of the following circumstances pertain:

>    (1)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
>    (2)     such entity consents;
>
>    (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
>    (4)     such interest is in bona fide dispute; or
>
>    (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

30.     As indicated by the use of the disjunctive term "or," satisfaction of any one of the five requirements listed in Section 363(f) is sufficient to permit the sale of assets free and clear of Liens.  *See In re Elliott*, 94 B.R. 343, 345 (E.D. Pa. 1988) (stating that Section 363(f) is written in the disjunctive; the court may approve a sale "free and clear" provided that at least one of the subsections is met).

31.     In this instance, the Debtors believe that all entities holding or asserting a security interest in the Purchased Assets will (i) consent to the transaction presented for approval at the Sale Hearing, or (ii) receive cash from the sale proceeds sufficient to pay their secured claims in full.

32.     The Debtors propose that any Liens against the Purchased Assets (other than Permitted Liens and Assumed Liabilities, as such terms are defined in the Agreement) attach to the proceeds of the sale.   Based on the above, the requirements of Section 363(f) of the Bankruptcy Code can be satisfied, and the sale of the Purchased Assets free and clear of all liens, claims, encumbrances and other interests is appropriate.

**C.     The Prevailing Bidder Should Be Afforded All Protections Under Bankruptcy Code Section 363(m) as a Good Faith Purchaser.**

33.     Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . ."  11 U.S.C. § 363(m).

34.     As discussed above, the Proposed Sale Process and the bidding procedures contemplated as a part thereof (if and in whatever form approved at the Bidding Procedures Hearing), have been designed to create a fair, open and level playing field.   Accordingly, the Debtors request that the party submitting the Prevailing Bid be determined to have acted in good faith and be entitled to the protections of a good faith purchaser under Section 363(m) of the Bankruptcy Code.  *See*, *e.g.*, *In re United Press Int'l, Inc.*, No. 91 B 13955 (FGC), 1992 U.S. Bankr. LEXIS 842, at *3 (Bankr. S.D.N.Y.  May 18, 1992).   In this regard, the transaction reflected in the Agreement was negotiated by the parties at arm's length and in good faith, and the Stalking Horse Purchaser and its affiliates (i) are not "insiders" or affiliates of the Debtors, and (ii) do not have any relationship to the Debtors that has not been fully disclosed to the Court.

**D.     Section 365 Authorizes the Assumption and Assignment of Executory Contracts and Unexpired Leases.**

35.     The Agreement also contemplates the assumption of certain executory contracts and unexpired leases and the assignment of these contracts and leases to the Stalking Horse Purchaser.  The amount of the cure costs will be material to confirm in order for any transaction to proceed, and for determinations to be made by the time of closing by the Prevailing Bidder. Accordingly, the Debtors also respectfully seek provisions in the Sale Order (i) authorizing the Debtors to assume and assign the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code, (ii) fixing and determining on a final and irrevocable basis the cure amounts identified in the Cure Notice as the exact amounts that must be paid to the non-debtor contract counterparties parties to the Assigned Contracts (the "Cure Costs"), (iii) authorizing and directing the Debtors or the Purchaser (as applicable) to pay the Cure Costs promptly following the closing or, with respect to Designation Rights Assets, promptly following the date such Designation Rights Assets becomes an Assigned Contract, and (iv) deeming the parties to the Assigned Contracts adequately assured of future performance.

36.     Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Courts evaluate a decision to assume or reject an executory contract or unexpired  lease under the "business judgment" standard.  *See Chateaugay Corp*, 973 F.2d at 141; *see also In re Gardinier, Inc.*, 831 F.2d 974, 976 n.2 (11th Cir. 1987); *In re Wells*, 227 B.R. 553, 564 (Bankr. M.D. Fla. 1998); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984).  This standard is satisfied if the debtor determines in its business judgment that the assumption or rejection of the contract or lease would benefit the estate.  *See Sharon Steel Corp. v. National Fuel Gas Distr. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *In re Bicoastal Corp.*, 125 B.R. 658, 667 (Bankr. M.D. Fla. 1991).  The business judgment standard requires that the court

approve the debtor's business decision unless that judgment is the product of bad faith, whim, or caprice.  *See Lubrizol Enter. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985); *In re Prime Motor Inns*, 124 B.R. 378, 383 (S.D. Fla. 1991).

37.    Here, the Assigned Contracts are integral assets of the Business, and the Debtors have determined, in the exercise of their business judgment, that the assumption and assignment of the Assigned Contracts in connection with a sale of the Purchased Assets is necessary to yield significant value and benefit to the Debtors and their estates from the sale of the Purchased Assets.

38.    The Debtors also request that the Court fix the amount of Cure Costs due under the Assigned Contracts in connection with the requirement in Section 365(b)(1) of the Bankruptcy Code that the debtor in possession, at the time of assumption, cure defaults in any executory contract or unexpired lease being assumed, or provide adequate assurance that the default will be promptly cured.  In anticipation of the sale of the Business, the Debtors carefully reviewed their books and records, calculated all of the arrearages and overdue amounts owing on the Assigned Contracts, and determined that the Cure Costs identified in the Cure Notice are the exact amounts that should be paid to the non-debtor parties to the Assigned Contracts.

39.    To the Debtors' knowledge, there are no defaults under the Assigned Contracts that are required to be cured or for which there is compensation due, other than the Cure Costs. The Debtors strongly believe that, in furtherance of the goal of maximizing value for their estates and creditors and to enable a Stalking Horse Purchaser to be confirmed, they have done all that is possible to secure the highest or best possible offer for the Purchased Assets under the circumstances.   Accordingly, the Debtors respectfully request that this Court include in the Sale Order provisions (i) authorizing the Debtors to assume and assign the Assigned Contracts to the

Stalking Horse Purchaser (or to the party that submits the Prevailing Bid) pursuant to Section 365 of the Bankruptcy Code, (ii) fixing the Cure Costs as the exact amounts needed to cure any defaults under the Assigned Contracts, (iii) authorizing and directing the Debtors or the Purchaser (as applicable) to pay the Cure Costs promptly following the closing or, with respect to Designation Rights Assets, promptly following the date such Designation Rights Assets becomes an Assigned Contract, and (iv) deeming the parties to the Assigned Contracts adequately assured of future performance by the Stalking Horse Purchaser (or by the party that submits the Prevailing Bid).

40.     Integral to the Stalking Horse Purchaser and believed to be important for any other interested potential purchaser is the ability to evaluate ongoing operations during the sale process, and indeed even following it.  The Debtors operate over 120 different restaurant locations under two brands in a number of states, and in each instance there are involved myriad considerations ranging from lease and operating costs to employees that need be evaluated by any purchaser of the business.  As a result, there is included in the Agreement an ability to designate Designation Rights Assets that will promote buyer interest in this sale process.  The Debtors also request that the Sale Order approve of the designation rights of the Purchaser set forth in Section 7.5 of the Agreement.  The Purchaser would not have agreed to the transactions set forth in the Agreement without such rights.

41.     The Debtors further request that the Sale Order approve the Debtor's entry into the Management Agreement set forth as Exhibit A to the Agreement. The Purchaser would not have agreed to the transactions set forth in the Agreement without the Debtor's entry into the Management Agreement.

42.     Sellers also request to have included in the Sale Order a provision that immediately upon the Closing, the Purchaser shall be entitled to continue to sell alcoholic beverages at the premises included in the Purchased Assets upon the same terms as the Debtors were selling such alcoholic beverages, until such time as the Purchaser has had the time and opportunity to obtain its own Liquor Licenses (as defined in the Agreement).

E.     **The Proposed Bidding Procedures and Breakup Fee Are Appropriate.**

43.     The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy and resources necessary to submit an Initial Overbid, and which the Debtors believe is fair and reasonable in view of the assets to be sold.  The Proposed Sale Process and, in particular, the proposed Breakup Fee, are reasonable and supported by applicable case law.

44.     Historically, bankruptcy courts have approved bidding incentives, including break-up fees awarded to an initial bidder or "stalking horse," in the event of a successful overbid based on the business judgment of the debtor.  *See*, *e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking"); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (noting that "the business judgment of the Debtor is the standard applied under the law in this district" and applying the standard to a break-up fee); *Asarco, Inc. v. Elliot Mgmt. (In re Asarco, LLC)*, 650 F.3d 593, 597-98, 601-03 n.9 (5th Cir. 2011).

45.     The Third Circuit Court of Appeals has also addressed the appropriate standard for determining whether proposed bidding incentives in the bankruptcy context are appropriate. In *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl Energy, Inc.)*, 181 F.3d 527

(3d Cir. 1999), the Court of Appeals held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Section 503(b) of the Bankruptcy Code govern bidding incentives in the bankruptcy context.  Finding no "compelling justification" for treating an application for break-up fees and expenses under Section 503(b) any differently from other applications for administrative expenses, the Court concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowance and payment of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Id.* at 535.

46.     In *O'Brien*, the Third Circuit identified at least two circumstances in which bidding incentives may provide actual benefit to the estate, justifying administrative expense status.  First, there exists an actual benefit to the estate where "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.  Second, where the availability of bidding incentives induces a prospective buyer to research the value of the debtor and submit a bid that serves as a minimum bid on which other bidders can rely, the initial "bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the Debtors is sold will reflect its true worth." *Id*.  Both of those circumstances exist in this case because the inducement of the Breakup Fee was critical in persuading the Stalking Horse Purchaser to make an initial offer (which will serve as a "floor" for other bidders in connection with the Proposed Sale Process) and to expend the time and resources associated with

conducting due diligence regarding the Business and with negotiating and entering into the Agreement.

47.     Under the "administrative expense" standard enunciated in *O'Brien*, as well as the "sound business judgment" standard followed in other jurisdictions (including the Fifth Circuit), the Bidding Procedures proposed by the Debtors should be approved as fair and reasonable. Moreover, here there are exigencies in the nature of the Business to be sold, in a deteriorating market environment, where the consumer orientation of the Business can be adversely influenced by the bankruptcy process.   Under the circumstances, and after considerable arms length negotiation between the Debtors and stakeholders it represents on the one hand and the Stalking Horse Purchaser on the other hand, the proposed Breakup Fee of $1,500,000, which is three percent (3%) of the cash purchase price of $50,000,000, is reasonable and generally consistent with the range of bidding protection typically approved by bankruptcy courts in Texas.  *See*, *e.g.*, *In re Stone Energy Corp.,* No. 16-36390 (MI) (Bankr. S.D. Tex. Jan. 18, 2017) (court approved 3% break-up fee); *In re UGHS Senior Living, Inc.*, No. 15-80399 (DRJ) (Bankr. S.D. Tex. Nov. 24, 2015) (court approved 3% break-up fee and 1 % expense reimbursement); *In re Enron Corp.*, No. 01-16034 (AJG) (Bankr. S.D.N.Y., Apr. 8, 2004) (court approved break-up fee equal to 5% of the purchase price); *In re TransCom USA Mgmt Co., L.P.*, No. 01-35158 (KKB) (Bankr. S.D. Tex. Feb. 12, 2002) (court approved break-up fee of more than 3.6% of the purchase price).

48.     Furthermore, pursuant to the Agreement, the entry of a Bidding Procedures Order approving the Breakup Fee is a condition precedent that must be satisfied before the Stalking Horse Purchaser is obligated to proceed further, much less close the transactions set forth in the Agreement.  Accordingly, if this Court does not enter the Bidding Procedures Order approving the Breakup Fee, the Stalking Horse Purchaser would not be obligated to proceed, it would be

entitled to get its initial deposit immediately returned by the escrow agent, and would not be bound to close the proposed transaction and purchase the Purchased Assets.

49.     Therefore, because the procedures and incentives included in the Proposed Sale Process, including the proposed Breakup Fee, are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Purchased Assets and thereby confer actual benefits upon the estates herein, and are within the range of incentives customarily approved by courts, such procedures should be approved in these chapter 11 cases.

**F.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

50.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease... is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise."   The Debtors request that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## Notice

51.     This Motion will be served, and further notice of the Auction, the Proposed Sale Process, the Sale Hearing and the proposed sale by the Debtors of the Purchased Assets will be given, in accordance with the procedures set forth above.  The Debtors respectfully submit that such notice is sufficient and proper under the circumstances, and that no other or further notice is required.

## Conclusion

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court (a) enter an order following the Bidding Procedures Hearing, substantially in the form attached hereto as Exhibit A, (i) approving the Proposed Sale Process (including payment of the Breakup Fee), and (ii) authorizing the Debtors to take all actions reasonably necessary to effectuate such Proposed Sale Process and the sale presented in accordance therewith; (b) enter the Sale Order following the Sale Hearing, approving the highest or best bid for the Purchased Assets and granting the other relief requested in this Motion; and (c) grant such other and further relief as the Court deems just and proper.

Date:  June 6, 2017                        Respectfully submitted,
       Houston, Texas

                                           KING & SPALDING LLP


                                           /s/ Edward Ripley
                                           Edward Ripley (Texas Bar No. 16935950)
                                           1100 Louisiana Street, Suite 4000
                                           Houston, Texas 77002
                                           Telephone:  713-751-3200
                                           Facsimile:  713-751-3290
                                           Email: ERipley@kslaw.com

                                           -and-

                                           Sarah R. Borders (*pro hac vice* admission
                                           pending)
                                           Jeffrey R. Dutson (*pro hac vice* admission
                                           pending)
                                           Elizabeth T. Dechant (*pro hac vice* admission
                                           pending)
                                           1180 Peachtree Street, NE
                                           Atlanta, Georgia 30309
                                           Telephone:  404-572-4600
                                           Email: SBorders@kslaw.com
                                                  JDutson@kslaw.com
                                                  EDechant@kslaw.com

                                           *Proposed Counsel for the Debtors and
                                           Debtors-in-Possession*